# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BETH A. WAGNER,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

CIVIL ACTION NO. 5:16-cv-14012

DISTRICT JUDGE JOHN CORBETT O'MEARA

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 20)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Wagner is not disabled. Accordingly, **IT IS RECOMMENDED** that Wagner's Motion for Summary Judgment, (Doc. 16), be **DENIED**, that the Commissioner's Motion, (Doc. 20), be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Beth Wagner's ("Wagner") claim for a period of disability and Disability Insurance Benefits under Title II, 42 U.S.C. § 401 *et seq.*, as well as

1

Supplemental Security Income benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 20).

On March 21, 2014, Wagner filed an application for DIB, alleging a disability onset date of July 19, 2013. (Tr. 19, 37, 102, 228-34). She followed this with a separate SSI application on June 23, 2015, alleging the same onset date. (Tr. 251-57). The Commissioner denied her claim. (Tr. 102-20). Wagner then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on September 10, 2015 before ALJ Virginia Herring. (Tr. 57-100). The ALJ issued a decision on November 23, 2015, finding Wagner not disabled as to her Title II claim, (Tr. 34-56), and amended this decision on November 28, 2015, to find Wagner similarly not disabled as to her Title XVI claim, (Tr. 16-33). On September 13, 2016, the Appeals Council denied review, (Tr. 1-6), and Wagner filed for judicial review of that final decision on November 11, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two. 20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Wagner not disabled under the Act. (Tr. 37-50). At Step One, the ALJ found that Wagner last met the insured status requirements of the Social Security Act on December 31, 2018, and had not engaged in substantial gainful activity in the interval between her alleged onset date, July 19, 2013, and her date last insured. (Tr. 39). At Step Two, the ALJ concluded that the following impairments qualified as severe: migraines, degenerative disc disease, obesity, asthma, major depressive disorder, and panic disorder. (Tr. 39-40). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 40-43). Thereafter, the ALJ found that Wagner had the residual functional capacity ("RFC") to perform light work, except:

> [S]he can lift 20 pounds occasionally and 10 pounds frequently. She can sit six out of eight hours in a workday, each. She can stand and walk four out of eight hours in a workday, each. She must be able to be able to change positions between sitting and standing while remaining at her workstation, every 45-60 minutes. She can climb stairs and ramps frequently, but never

climb ladders, ropes, or scaffolds. She can balance and stoop frequently, and kneel, crouch, and crawl occasionally. She can reach overhead only occasionally. She is limited to simple, work-related decisions; simple, routine, repetitive tasks; and few changes in the workplace, and those changes need to be fully explained and gradually introduced. She cannot work at a production rate pace such as on an assembly line or conveyor belt.

(Tr. 43). At Step Four, the ALJ found Wagner incapable of performing her past relevant work. (Tr. 48). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Wagner can perform. (Tr. 49-50).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Wagner's medical records. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Function Report

Wagner filled out a Function Report on June 27, 2014, which appears in the administrative record. (Tr. 294-303). She described "chronic migraines" that prevented information from "process[ing] from point A to point B in my brain. I forget things that I may have said or done just a few minutes earlier. I repeat myself frequently because I don't remember who or when I may have told someone something. The abortive medications that I use for my migraines make me sleepy. I can be speaking to someone and in mid-sentence completely lose my train of thought or what I was talking about."

(Tr. 296, 303). A concussion in May 2012 sparked these issues, as "[a]fter that my memory issues seem to have become more severe." (Tr. 303). She noted that "problems with depression" and "anxiety" interrupted tasks around the house and kept her tethered to a seat. (*Id.*). "Some days I sit [and] watch TV all day." (*Id.*). In addition to these problems, Wagner suffered from "scoliosis and degenerative joint disease," "mildly bulging discs in my neck," "arthritic [and] degen[erative] changes in [her] upper back," and "spinal stenosis in my neck [and] lower back." (*Id.*).

Ultimately, she contends, these issues ended her career: "I resigned my position on July 19, 2013. . . . I had been in a disciplinary process since January 2013. I was making errors in my work. I would forget to send updated and/or admission clinical review to the insurance payor. I was forgetting to do prenotes on our BlueCross patients. All of these things are to be completed within 24 hours of the patient's admission or on the first business day if the patient is admitted on the weekend or on a holiday." (Tr. 294). No such memory deficits existed until her concussion. (*Id.*). "I was also dizzy all the time and did several weeks of vestibular rehab," but a "severe migraine" in August 2012 exacerbated her condition, leading to a ten-day hospitalization in October 2012. (*Id.*).

Each day, Wagner would "[m]ake coffee, eat breakfast, do my daily devotions, sit outside [and] watch the birds at my feeders," tend to her garden, "[g]o to [an appointment] or [B]ible study depend[ing] on [the] day of the week," and "[t]hink about all the things I need to do for the day." (Tr. 297). Even with assistance from medication, she found herself "unable to sleep for more than 4 hours at night . . . ." (*Id.*). She listed no issues attending to personal care (e.g., dressing, bathing, caring for hair, shaving, etc.),

but set reminders to take her proper medication on time. (Tr. 298). She prepared "simple meals like soup or sandwich[es]" on a daily basis, "but occasionally" cooked meat, vegetables, or potatoes. (*Id.*). She sometimes forgot to eat throughout the day. (*Id.*).

She continued to perform a variety of household tasks and yard work, such as "cleaning, laundry, ironing," and "mowing." (*Id.*). Distractions impeded her progress, and she required help with "anything requiring heavy lifting." (*Id.*). She left the house to walk or drive on a daily basis, shopped in stores, and retained the capacity to handle her finances. (Tr. 299). "I don't always remember to record money spent on debit/credit card[s]. I have been late paying bills sometimes because I know roughly when they're [due] but forget to follow [through]." (Tr. 300). In her free time, she enjoyed "[r]eading, sewing, crocheting, cross-stitching," and "watching TV." (*Id.*). Although she watched television on a regular basis, she only "sporadically" engaged in her other hobbies. (*Id.*). Memory deficits prevented her from finishing much of what she started. (*Id.*).

On a weekly basis, Wagner socialized and went to restaurants. (*Id.*). She attended church services once or twice a week. (*Id.*). "I am probably less likely to participate in conversations with people I don't know well because I have difficulty remembering names." (Tr. 301).

Prompted to identify abilities with which she encountered trouble, Wagner marked: lifting, standing, walking, sitting, memory, completing tasks, concentration, understanding, and following instructions. (*Id.*). She could stand for approximately an hour, "but then my back hurts. I don't walk much for exercise so it's hard to tell distance," and pain in her back and legs usually stopped her. (*Id.*). She could pay

attention for the entirety of a one-hour church service "as long as I'm participating (looking up scripture)." (*Id.*). She sometimes struggled to follow written or spoken instructions when they were "complicated . . . ." (*Id.*). She did not handle stress well: "[I]t makes me anxious, then my mind gets caught up in the 'what ifs' and I find it difficult to do anything. I'm unable to turn my mind off and can become totally lost in my thoughts." (Tr. 302). This occurred when she drove to unfamiliar places, "even with a GPS." (*Id.*).

ii.        **Wagner's Testimony at the Administrative Hearings**

Wagner opened her testimony by describing her neighborhood. (Tr. 64-65). She lived in a "manufactured home community" and had to climb "five steps . . . up to my front porch." (Tr. 65). She lived alone. (Tr. 70). "I am able to walk those five steps, go up and down. Coming down the steps I do use the rail for assistance sometimes." (Tr. 66). Although she could easily handle a limited amount of steps, anything more than ten steps "starts to pose a problem." (*Id.*). Her daughter drove her to the hearing because "I am very directionally challenged . . . and navigating the streets creates tremendous anxiety for me." (Tr. 67). If needed, she could take public transportation, "but I'd be anxious . . . if I had to make any changes anyplace along the way." (*Id.*). "I always get nervous when I drive." (Tr. 68). These anxieties had increased in the three years leading up to the hearing, sparked by the death of her husband. (Tr. 69).

Asked why she left a prior job as a staff nurse, Wagner highlighted "problems with my shoulders" and "scoliosis which causes a lot of back pain . . . ." (Tr. 70). Just before her husband died, she "had both my rotator cuffs torn and repaired in the course of pulling on people," and this pain coupled with the mental strain from her husband's death

left Wagner increasingly "uncomfortable." (Tr. 71). "I felt like somebody had beat me with a baseball bat all night. My back, my shoulders, everything was just so painful." (*Id.*). She began working a different job as a "utilization review coordinator," where she stayed until finally resigning in 2013. (Tr. 72). "I worked there for two years and in the end of April I had, I suffered a concussion. I've had chronic migraines since I was in my thirties, I think, was when I was formally diagnosed. But I also suffered a concussion in 2012, with a loss of consciousness for about an hour. After that time I noticed that I had a lot of difficulty completing the volume of work that I used to do and I started to forget tasks. . . . [A]long with . . . having headaches frequently, the short-term memory thing was a new thing." (Tr. 73).

Soon thereafter, Wagner was told that her medical problems were affecting her work performance. (Tr. 74). She took a medical leave and began treating with Michigan Head Pain Neurological Institute in Ann Arbor, because her headaches "were becoming more frequent. . . . I did have one disciplinary corrective behavior report when I was working with utilization for excessive absenteeism related to the headaches." (Tr. 75). Her hospitalization lasted ten days, but "I can't say that we ever got complete control of the headaches. . . . They just never improved." (Tr. 75-76). On the eve of her resignation, Wagner was enduring headaches five or six days a week, each lasting six to eight hours. (Tr. 76). "I've had episodes two or three days." (*Id.*). Moreover, "[s]ometimes it takes me several different things before I can get improvement. Sometimes the improvement may come with one dose of medication. Sometimes it may take more than one dose of more than one medication in addition to hot and cold compresses, not doing anything except

laying down." (Tr. 77). To alleviate pain from other sources—*i.e.*, joint pain, back pain, and neck pain—she utilized physical therapy. (Tr. 77-78). It only helped ease pain on occasion. (Tr. 79).

In a typical day, Wagner found sleeping for prolonged periods of time difficult, and got an average of four to six hours per night. (Tr. 79). In activities of daily living, she proved fairly independent: "I prepare my own food. I take my own medications. I try to maintain a routine as far as the medications. If I don't take them when I first get up in the morning, . . . I will forget to take them and it might be noon before I realize that I haven't taken my medication in the morning." (Tr. 80-81). She could vacuum for approximately twenty minutes before needing to stop "because just the pushing the vacuum makes my shoulders hurt . . . ." (Tr. 82). She tried to elevate her feet each day as well, particularly if she spent a while on her feet, in a position "a little more reclined than semi-Fowler . . . sitting with my feet probably at waist level." (Tr. 83). In an average week, Wagner spent "more time sitting in my recliner than I do standing upright." (Tr. 84). She estimated an ability to stand for "[p]robably 30 minutes" without wiping herself out for the day entirely. (Tr. 85-86).

Wagner also retained the capacity to grocery shop: "I do push the cart, although I do lean on the cart for support. When I'm lifting, like probably the heaviest thing I put in my cart is a gallon of milk . . . . and like a gallon of milk is probably the heaviest I can lift, or a grocery bag that maybe has a few cans in it, you know, nothing that's packed really heavy." (Tr. 86). After washing dishes, she had few issues putting them away "[i]f I don't have to reach too high . . . ." (Tr. 88). But Wagner could not lift her arms above

her head. (*Id.*). In addition, "I like to sew as a hobby but I can't do that for very long at a time because of the position that you're in for sewing causes me discomfort." (Tr. 89). Nor could Wagner crouch, as "it makes my knees hurt and it makes my back hurt." (Tr. 89-90).

Asked about her depression and anxiety, Wagner indicated that "[p]robably the biggest thing is my anxiety about my ability to do a job because of the problems that I have with my memory. It's hard for me to pull information forward when I need it. I turn phrases. I can be talking and lose my train of thought in a middle of a sentence. And sometimes with some verbal queuing I might be able to get it back, but other times I'm not able to get it back." (Tr. 91).

In her closing remarks, Wagner tried to summarize why she felt entitled to disability benefits:

> [T]here's not a day that I have now that I don't have some degree of pain, whether it be headache, my back or my neck. It's very difficult for me to not be as independent and functional as I used to be. To not be able to remember, I always prided myself on my ability to remember and to have control of situations, and I needed that as a nurse and I, I can't, I don't, I don't feel like I even have control of my home situation. I mean I just feel, I just don't like being out of control of the situation and not being able to do things for myself. I mean there are things that I do do for myself, but I, and my son or my stepson mows my lawn. I can't lift heavy things. When my grandson wants to give me a hug I have to caution him not, not to pull on my neck because it's going to hurt nana.

(Tr. 92-93). The ALJ then proceeded to call upon the services of the VE in attendance. (Tr. 93).

### iii. The VE's Testimony at the Administrative Hearings

The ALJ's first hypothetical to the VE imagined an individual with "more than high school education and she has a skilled past relevant work. . . . [T]his hypothetical person can . . . lift 20 pounds occasionally and 10 pounds frequently. Can sit, stand and walk six of eight hours in a day each. Can climb stairs and ramps frequently but never ladders, ropes or scaffolds. She can balance and stoop frequently and kneel, crouch and crawl occasionally. She can reach overhead only occasionally. She is limited to simple work related decisions; simple, routine, repetitive tasks; but there are few changes in the workplace and those changes need to be fully explained and gradually introduced and that there's no production rate, pace. Can this person perform the claimant's past relevant work?" (Tr. 94-95). The VE indicated that such a person could not perform Wagner's past work, but other work would exist in the national economy for such a person, including: cashier—with 1,185,000 national job availabilities and 35,000 regional job availabilities—cleaner—with 394,000 national job availabilities and 9,400 regional job availabilities—and laundry worker—with 90,000 national job availabilities and 2,600 regional job availabilities. (Tr. 95).

The ALJ's second hypothetical retained the limitations set forth in her first but added an "ability to stand and walk . . . limited to four of eight hours each." (*Id.*). The VE again provided examples of light work available in the national economy, such as: inspector—with 40,000 national job availabilities and 1,800 regional job availabilities—assembler—with 100,000 national job availabilities and 4,500 regional job

availabilities—and office helper—with 150,000 national job availabilities and 5,500 regional job availabilities. (Tr. 95-96).

In the ALJ's third hypothetical, he furnished an additional restriction that "this same hypothetical individual needed to be able to change positions between sitting and a standing position while remaining at their work station every 45 to 60 minutes, . . ." (Tr. 96). The VE indicated that the jobs supplied in response to the ALJ's previous hypothetical applied equally to this one. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527.

Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Wagner supplies two arguments in her memorandum: (1) the ALJ improperly assigned little weight to the medical opinion of consultative examiner Dr. Bishop, (Doc. 16 at ID 1186-88); and (2) the ALJ failed to include limitations indicating that Wagner's chronic back pain, migraines, and mental conditions would cause her to be off-task much

of the time in her RFC assessment, depriving her Step Five finding of the support of substantial evidence, (Doc. 16 at ID 1188-91). I address each argument in turn.

### 1. The Bishop Opinion

Wagner first avers that the ALJ failed to comply with 20 C.F.R. §§ 404.1527, 416.927, and SSR 96-6p, 1996 WL 374180 (S.S.A. July 2, 1996) in evaluating the medical opinion of consultative examiner Dr. Bishop. In her estimation, the ALJ discredited Dr. Bishop's opinion because "it was based on the reported severity of the claimant's impairments," which grates against her finding that Wagner was "'mostly credible.'" (Doc. 16 at ID 1187) (quoting (Tr. 47)). "Surely assigning weight that contradicts the ALJ's credibility determination does not satisfy the requirements set forth in the Code of Federal Regulations and Social Security Rulings." (Doc. 16 at ID 1188).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating* source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure

that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

Wagner's argument as to Dr. Bishop's weight assignment cannot prevail because the ALJ's determination could not have been internally inconsistent in the manner alleged because she did not rest Dr. Bishop's weight assignment on Wagner's credibility. Rather, the ALJ provided three separate reasons for discrediting the opinion: (i) Dr. Bishop's examination was internally inconsistent, particularly as to Wagner's memory; (ii) in opining on Wagner's physical limitations, Dr. Bishop ventured outside her area of expertise; and (iii) Dr. Bishop did not translate her findings into functional limitations, rendering the opinion vague. (Tr. 47). Each reason proves amply supported by the record. *See* (Tr. 768) (stating conclusorily that Wagner could not hold consistent employment). *See generally* (Tr. 766-69) (relaying a normal memory test and describing Wagner as having a good attitude, clear speech, an ability to socialize, a capacity to manage her finances, and an independent lifestyle). Accordingly, the ALJ's treatment of Dr. Bishop's opinion remains supported by substantial evidence. *Cf., e.g.*, *Green v. Comm'r of Soc. Sec. Admin.*, No. 1:15CV1939, 2016 WL 3230675, at *11 (N.D. Ohio June 13, 2016) (vagueness and conclusory statements constitute "good reasons" for discrediting a medical source statement).

Even assuming Wagner's credibility factored into the ALJ's calculus, no inconsistency would be unveiled—in context, the ALJ only found Wagner "mostly credible" with respect to her descriptions of her work history. (Tr. 47). Earlier in the opinion, the ALJ expressly indicated that Wagner's view of her own limitations was "not entirely credible," and proceeded to illustrate why, (Tr. 44); she repeated these reasons when explaining that, although Wagner could not return to her past work, "[t]he claimant's medical evidence and her daily activities do not support a more restrictive residual functional capacity," (Tr. 47).[1] Of some import, Wagner fails to challenge this negative aspect of the ALJ's credibility finding, thereby conceding its legitimacy.

For these reasons, the ALJ appropriately evaluated Dr. Bishop's opinion, and the Court should reject Wagner's argument on this front.

## 2. The RFC

Wagner next contends that the ALJ failed to include documented limitations as to "the likely time the Plaintiff would be off task due to her migraine headaches, chronic pain, and mental conditions," and "did not pose any hypotheticals to the VE considering likely time spent off task," resulting in remandable error at Step Five of the analysis. (Doc. 16 at ID 1189-90). In making this argument, Wagner places heavy reliance on her own testimony that she struggles with prolonged periods of movement—including walking, standing, and driving—and alleges that these difficulties resulted in absenteeism at a prior job. (Doc. 16 at ID 1190) (citing (Tr. 66, 68, 75, 82, 83)). She also gestures

---

[1] Because I address the evidence underlying these findings at some length in the next section, I omit a longer discussion thereof at this juncture.

towards "multiple MRI's" that "support chronic back pain" as well. (*Id.*) (citing (Tr. 398, 401)). Because the ALJ described her testimony as "mostly credible," (Tr. 47), Wagner avers that failure to include the limitations she described into her RFC assessment—or into the hypothetical questions posed the VE—undermines her ultimate conclusions. (Doc. 16 at ID 1190-91).

A claimant bears the burden of proving her functional limitations through Step Four of the five-step sequential analysis, and the Commissioner bears the burden only at Step Five. *Accord, e.g.*, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The argument Wagner furnishes is camouflaged as a Step-Five attack, but she unmistakably bore the burden to establish the limitations she now claims, and the ALJ was never obligated to include unsubstantiated limitations in questions to the VE. *See McDay v. Comm'r of Soc. Sec.*, No. 1:09-CV-1085, 2011 WL 1211720, at *10 (W.D. Mich. Mar. 14, 2011), *report and recommendation adopted,* No. 1:09-CV-1085, 2011 WL 1156326 (W.D. Mich. Mar. 29, 2011) ("It is well settled that a hypothetical question to a VE need not include unsubstantiated limitations.").

Here, the ALJ expressly did *not* find Wagner's statements as to her functional limitations 'mostly credible,' (Tr. 44) ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are *not entirely credible* for the reasons explained in this decision." (emphasis added)), and illustrated her reasons why. (Tr. 44-48). Records regarding her back pain, for instance, lacked certain hallmarks of severe spinal issues and had only a minimal impact on her activities of daily living. (Tr. 44, 47); (Tr. 405, 438, 445, 455, 501, 545, 582, 767, 793, 858, 878) (normal gait);

(Tr. 377, 379, 398, 401, 628, 632, 678, 764) (objective evidence showing only mild to moderate abnormality); (Tr. 767, 1098) (independence in activities of daily living); (Tr. 299) (proficiency in walking, shopping, and driving alone). Her headaches improved over time. (Tr. 45); (Tr. 841, 843, 965, 972, 990) (documenting improvement beginning in 2013 and throughout 2014). Mental examinations regularly revealed few abnormalities resulting from depression, anxiety, or memory problems. (Tr. 45-46); (Tr. 467, 469-73, 485, 491, 602, 753, 767, 793, 1052-96) (normal and/or logical thought and/or speech); (Tr. 420, 467, 469-70, 485, 491, 713, 767, 793, 1031-43, 1052-96) (appropriate dress and/or well-groomed); (Tr. 405, 420, 438, 444, 450, 455, 467, 469-73, 485, 491, 545, 602, 713, 753, 768, 793, 878, 884, 891, 904, 918, 1029, 1031-43, 1052-96) (alert and oriented); Tr. 467. 469-73, 474, 485, 491, 754) (absence of suicidal or homicidal ideation); (Tr. 467, 469-73, 485, 545, 602, 707, 753) (unimpaired or adequate memory); (Tr. 300-01) (able to handle finances and follow instructions); (Tr. 467, 469-73, 476-83, 1031-43, 1052-96) (improvement in mental condition). Additionally, Wagner had little difficulty interacting with others. (Tr. 300-01) (attended church services, dined at restaurants, spent time with friends regularly). To the extent the ALJ found limitations flowing from these conditions, the ALJ accounted for them in her RFC and her questions to the VE. (Tr. 46) ("The undersigned considered the claimant's migraines and mental impairments [and anxiety] when assessing her residual functional capacity. . . . when restricting her from jobs involving a production rate pace. Additional limitations are not warranted."). The ALJ thoroughly recounted this evidence, validating her findings.

Because the ALJ rested her RFC determination on substantial evidence, Wagner cannot demonstrate any error in the ALJ's Step Five finding that would warrant remand, and the Court should find any such argument unpersuasive.

### H.     Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Wagner's Motion for Summary Judgment, (Doc. 16), be **DENIED**, that the Commissioner's Motion, (Doc. 20), be **GRANTED**, and that this case be **AFFIRMED**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 19, 2017                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 19, 2017                   By s/Kristen Castaneda
                                      Case Manager